(C.D. 2625)

B. Levy & Sons *v.* United States

United States Customs Court, First Division

(Decided March 7, 1966)

*Siegel, Mandell & Davidson* (*David Serko* and *Murray Sklaroff* of counsel) for the plaintiff.

*John W. Douglas*, Assistant Attorney General (*Mollie Strum* and *James S. O'Kelly*, trial attorneys), for the defendant.

Before OLIVER, WILSON, and NICHOLS, Judges; NICHOLS, J., concurring

OLIVER, Judge: The protest in this case involves importations of merchandise which were described on the invoices as "boys goggles" and assessed with duty at the compound rate of 10 cents per dozen, plus 7½ per centum ad valorem, under the provisions of paragraph 225, Tariff Act of 1930, as modified by T.D. 53865 and T.D. 53877, as goggles valued not over 65 cents per dozen. Plaintiff claims that the merchandise is correctly classifiable as a nonenumerated manufactured article under the provisions of paragraph 1558 of said tariff act, as modified, and therein dutiable at the rate of 10 per centum ad valorem. Alternatively, it is plaintiff's contention that the articles are toys, as provided for under paragraph 1513 and dutiable at the modified rate of 35 per centum ad valorem. A further claim for classification under the provisions of paragraph 31 was formally abandoned. (R. 61.)

The article in question consists of a green-colored plastic frame connecting two tube-like projections for placement over the eyes. Each tube contains a plastic lens or eyepiece. The article is secured around the head by means of a plastic strap and buckle. The material is in chief value of various synthetic resins, none of which serve as binding agents (plaintiff's exhibit 5, R. 61).

The relevant portions of the tariff act are as follows:

Paragraph 225, Tariff Act of 1930, as modified by the Protocol of Terms of Accession of Japan to the General Agreement on Tariffs and Trade, T.D. 53865, supplemented by T.D. 53877:

Spectacles, eyeglasses, and goggles, and frames for
the same, or parts thereof, finished or unfin-
ished, valued per dozen—
     Not over 65 cents_____ 10¢ per doz. and
                                       7½% ad val.

Paragraph 1558, Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, supplemented by T.D. 52827:

Articles manufactured, in whole or in part, not specially
provided for (except * * *)_____ 10% ad val.

Paragraph 1513, Tariff Act of 1930, as modified by the Torquay protocol, *supra*, supplemented by T.D. 52820:

Toys, not specially provided for:
  *        *        *        *        *        *        *
  Other (except * * *)_____ 35% ad val.
  *        *        *        *        *        *        *

The term "toy," as defined in paragraph 1513 as originally enacted, means:

* * * As used in this paragraph the term "toy" means an article chiefly used for the amusement of children, whether or not also suitable for physical exercise or for mental development. The rates provided for in this paragraph shall apply to articles enumerated or described herein, whether or not more specifically provided for elsewhere in this Act.

At the trial, plaintiff called three witnesses and introduced six exhibits into evidence. An additional exhibit, plaintiff's exhibit 3–A, was marked for identification but was not received in evidence. Defendant had no witnesses and offered no exhibits.

Plaintiff's first witness was Doctor Paul Henkind, a graduate of the New York University Medical School, a licensed physician in the State of New York and, at that time, chief resident in opthalmology at Bellevue Hospital. Dr. Henkind's credentials in his field were impressive and his qualifications were conceded by Government counsel (R. 13). His practical experience had ranged from the giving of eye examinations and the writing of prescriptions for glasses to surgery and consultations in connection with eye diseases and various disorders relating to the eye.

Dr. Henkind testified to the following: That he was familiar with plaintiff's exhibit 2, a representative sample of the imported merchandise which had been received in evidence (R. 15), and that he had examined it for both its optical properties and its fit and suitability as an optical device; that he had performed three tests on the merchandise in the optics laboratories of New York and Columbia Universities with the following results: (1) a person with uncorrected 20/20 vision was unable to read the bottom line on an optical chart (the so-called Snellen chart) while wearing the imported merchandise; (2) photographs (plaintiff's exhibit 3, R. 83–87) show that a photograph taken of a projected optical chart with the use of the imported items placed in front of the projector resulted in the blurred vision as indicated by picture "C" in plaintiff's exhibit 3, while the same chart photographed without any lens or optical device between the camera and projected picture, as in picture "A" in plaintiff's exhibit 3, or with a plane or planolens, as in picture "B" of the same exhibit, indicated a relatively clear vision; and (3) the imported eyepieces or lenses, when placed in a Bausch & Lomb Vertexometer and measured for power, indicated that the lenses possess an irregular astigmatic power, meaning they would produce one diopter of astigmatism on a person with no particular refractive error.

Dr. Henkind stated that, in his opinion, a goggle is fundamentally a protective device, not necessarily enhancing vision but definitely not interfering with it. The witness agreed to the following definition of the term "goggle" contained in Webster's New International Dictionary, which was read to him in court, and cited by this court with approval in *U.S.D. Importing Co. et al.* v. *United States*, 44 Cust. Ct. 360, Abstract 63864:

* * * that goggles are "* * * A kind of spectacles with short, projecting eye tubes, in the front end of which are fixed plain glasses for protecting the eyes from cold, dust, etc."

The witness explained that a lens can be either a plain piece of transparent glass or plastic that regularly permits light rays to pass through so that an image can be perceived which is neither enhanced or corrected, nor distorted or blurred in any noticeable manner, or a lens can have power to either diverge or converge rays of light in a regular fashion and thereby enhance or correct vision.

It was his stated opinion that the imported items contained neither a plane nor prescribed lens, since light rays passed through in an irregular fashion, distorting a perceived image and noticeably disturbing vision.

Dr. Henkind further stated that he had tested the imported articles for their physical suitability as protective devices for the eye and found them to be completely ineffective. He stated that, because of their in-

adequate construction in the nose area, the imported items, whether worn by adult or child, would allow air and materials to reach the eye from below; that the size of the frame makes it more difficult or impossible for use by an adult; that the frame and lenses are easily distorted out of shape; that the lenses permit only 85 to 90 percent of light to pass through and that they were easily scratched by the mere wiping of a handkerchief or by the accumulation of dirt. The witness concluded that, in his opinion, the imported items, because they decreased a perceived image and distorted vision, and because they were ill fitting and nonprotective, were not goggles. He had seen them used as playthings but never as a protective device.

On cross-examination, the witness testified that goggles are sold without prescription at drugstores and other places. He stated that he never prescribes goggles to anyone but simply advises whether one should wear them or not, and sometimes suggests different stores where protective goggles may be purchased. Further, the witness explained that the type of protective device worn by Eskimos, although not containing eyepieces or lenses, would, in his opinion, be considered goggles. The witness admitted that persons wearing the imported items could read some of the lines on the optical chart. Finally, he testified that the word "optical" is from Greek and Latin and merely means—relating to the eye.

On redirect examination, Dr. Henkind stated that he had never seen such items sold by opticians or optical stores. He further testified that even an optical device mounted with a clear glass or lens will cut down between 5 to 10 percent of light transmission.

Plaintiff's second witness was Jerry Pressner, employed by M. Pressner & Co. in the capacity of salesman, buyer, and assistant sales manager for the past 8 years. M. Pressner & Co. are importers of novelties, toys, souvenir, and carnival items. The company does business throughout the United States. Mr. Pressner testified that he was familiar with the involved merchandise, having sold it for 2 to 3 years to toy and novelty jobbers in Hawaii, California, and on the West Coast. He stated that he had visited his customers and that none of them deal in optical goods, such as binoculars, glasses, and optometrists' supplies. He had seen the merchandise used both in his home town, New York, and on the West Coast by children in playing various games of make-believe. He never saw adults using these items.

On cross-examination, after stating initially that only prescribed goggles would be considered optical goods in his opinion, he answered the following question in the following way:

XQ. And, therefore, regardless of value, are they optical goods?— A. It depends upon the amount of protection afforded.

Plaintiff's final witness, Mr. Harold S. Katcher, stated that he had been employed by M. Pressner & Co. for over 9 years in a sales capacity, selling both in New York City and in the Southeastern States from Virginia to Florida and parts of Tennessee, Georgia, and Alabama.

Mr. Katcher testified that he was personally familiar with the imported items and had sold them to toy, novelty, and carnival jobbers. He further testified that he had seen his children using the items while riding their bicycles and running around. Mr. Katcher, himself, had personally used the item for a masquerade party. Finally, he testified that he sells the imported items as goggles for lack of a better name.

On recalling Dr. Henkind to the stand, plaintiff introduced into evidence exhibit 6 (R. 81), a planolens. Dr. Henkind stated that it was a representative example of a plane lens having two regular surfaces but no power and, therefore, doing nothing to light rays which pass through.

On cross-examination, Dr. Henkind testified that most goggles that he is aware of possess such planolenses. It is an optical term used with the professions relating to optics.

Plaintiff argues in its brief that the tariff term "goggle" has been judicially construed not to include any article of superficial resemblance but only those items which protect the eye and, at the same time, do not impair vision.

Defendant, on the other hand, contends that the imported items, even though of cheap construction, fall within the *eo nomine* designation for goggles, which is a tariff designation without limitations and includes all forms of the articles named, citing *Nootka Packing Co. et al.* v. *United States*, 22 CCPA 464, T.D. 47464. Furthermore, that these imported articles are goggles as that term has been judicially construed since they are used to protect the eye, there being no requirement concerning the impairment of vision.

Long ago it was firmly established that goggles are separate and distinct from spectacles, eyeglasses, and optical instruments. *Bache & Co.* v. *United States*, 6 Ct. Cust. Appls. 507, T.D. 36128; *Strauss Bros. & Co.* v. *United States*, 15 Treas. Dec. 660, T.D. 29117. In the *Strauss Bros.* case, *supra*, the court said:

* * * It is a matter of common knowledge that eyeglasses and spectacles are designed to remedy or cure diseases of the eye or imperfections of sight, which services goggles mounted with common window glass do not perform. On the contrary, they are mere protectors for the eyes of bicyclists, motorists, and others.

This holding was cited with approval by the appellate court in the *Bache* case, *supra*, which noted that goggles were a peculiar kind of

spectacle which do not affect the light rays passing through them or alter or affect vision.

In *Siegel-Cooper Co. et al.* v. *United States*, 16 Treas. Dec. 276, T.D. 29327, the court had before it certain automobilists' goggles which had been classified as goggles under the Tariff Act of 1897 and were claimed to be dutiable at a rate applicable to their component material of chief value. In concluding that the articles were properly classified as goggles the court said:

Lexicographers define the word as follows:

Webster—

*Goggles.*—A kind of spectacle with short, projecting eye tubes, in the front end of which are fixed plain glasses for protecting the eyes from cold, dust, etc., or colored glasses for relief from intense light, or a disk with a small aperture, to direct the sight forward and cure squinting.

Century—

*Goggles.*—An instrument worn like spectacles, with plain or colored glasses fixed in short tubes spreading at the base over the eyes, for their protection from cold, dust, sparks, etc., or from too great intensity of light, or so contrived as to direct the eyes straight forward, in order to cure squinting.

The prime use of the articles in dispute is to protect the eyes from injury by foreign substances and at the same time permitting practically unobstructed passage of light rays; and it seems to us that what are unquestionably goggles if worn by a pedestrian would not lose their identity as such and become something else if worn by an automobilist for like purposes.

This construction of the tariff term "goggle" was expressly followed by this court in *U. S. D. Importing Co. et al.*, *supra*, which held that skin diving masks were not goggles. After referring to several dictionary definitions, which were not materially different from those cited in the *Siegel-Cooper* case, *supra*, the court held that the essential element of a goggle is protection of the eyes only and, since the masks operated to cover both eyes and nose while used under water, they were a different class of merchandise.

It seems clear from these cases construing the same term enacted through several tariff acts that, in order for an article to be classified as a goggle, it must afford protection to the eyes of the user while permitting light rays to pass through "practically unobstructed." The protection, of course, may vary with the function of the particular type of goggle. Some goggles have mere apertures over the eyes to direct sight forward and to prevent squinting. Others may have wire netting, no doubt for some industrial purpose. Still others have colored eyepieces to relieve the intensity of light. Finally, some

goggles are fixed with plain glass to guard against cold, wind, dust, etc.,[1] the type used by cyclists, motorists, and the like.

While the articles at bar have the general form and shape of goggles, as well as the name, this is not the sole test of their classification. *M. Pressner & Co.* v. *United States*, 44 Cust. Ct. 10, C.D. 2145; *Downing* v. *United States*, 9 Treas. Dec. 1012, T.D. 26454. The cases involving the construction of the term "goggles" have stressed their function and use, thereby restricting the application of the general rule of construction expressed in the *Nootka Packing* case, *supra*. The approach to be followed in this situation was explained by the appellate court in *Sears, Roebuck and Co.* v. *United States*, 46 CCPA 79, C.A.D. 701. In that case, the court held that certain umbrella shaped articles called "umbrellas" were, nevertheless, not classifiable under paragraph 1554 as umbrellas. In reaching this decision, the court observed:

* * * We must accordingly determine whether the said term is commonly understood to refer to a particular type of structure regardless of use or whether the term encompasses both the structure and a particular function or use of the device. * * * Though paragraph 1554 is an *eo nomine* classification, of course, it does not follow that any and all articles called "umbrellas" will be so classified.

The testimony in this case, which was mainly offered through plaintiff's first witness, Dr. Henkind, was to the effect that the imported articles are ill designed to afford protection against air or dirt. The lack of an adequate bridging area about the nose leaves the wearer's eyes subject to air and material blowing in from below. This is true whether the wearer be man or child. The recorded testimony in this respect is strongly corroborated by the mute testimony of the samples themselves. The entire structure is of such minimal proportions, whether for child or adult, and of such flimsy construction that its effective use in protecting the eyes is to be highly doubted. It is not that it is cheap for certainly the value brackets in paragraph 225 encompass inexpensive items,[2] but that it has little use as a protector for the eyes.

The testimony of plaintiff's witness, Dr. Henkind, on the visual properties of this merchandise lends support to the conclusion that the involved articles cannot properly function in the normal capacity of goggles. While it is true, as pointed out in defendant's brief, that some of the doctor's testimony was couched in terms of what the rather

---

[1] It is well known, and, *sub silentio*, accepted by the parties here, that plastics have been developed as substitutes for glass in many items without fundamentally changing their character. Tariff laws look to the future in this regard.

[2] It is noted that spectacles and eyeglasses, certainly associated with the idea of purposeful operation, fall within the same value bracket.

selected dealer in optical equipment might consider to be a goggle, nevertheless, much of his testimony has application to the whole class of merchandise. Of particular significance were the following two facts developed as a result of certain tests conducted by this witness: (1) that 85 to 90 percent of the light rays will pass through the plastic eyepieces of the imported articles and (2) the light rays pass through in an irregular manner causing some astigmatism to the wearer, as well as a certain amount of distortion in images perceived.

The defendant argues that the admission of 85 to 90 percent of the light rays through these items satisfies the court's construction of a goggle in the *Siegel-Cooper* case, *supra*, wherein the court said that light rays pass through goggles in a practically unobstructed manner. Further, that the impairment of vision or the distortion of images has never been construed as relevant to the tariff term "goggle."

We do not fully agree with that position. Several cases, as well as the common understanding of the operation of a goggle, suggest that visual accuracy is significant. In *United States* v. *American Thermo-Ware Co.*, 4 Ct. Cust. Appls. 21, T.D. 33218, the court rejected the Government's contention that certain pieces of bent window glass had been so far advanced in the manufacture of auto goggles as to have acquired a name, character, and use different from that of ordinary window glass. At one point the court observed:

\* \* \* Certainly pieces of glass which would present to the eye a distorted landscape and which would *tend* to increase rather than diminish the visual vagaries of the average chauffeur can hardly be considered as finished and completed constituent parts of automobile goggles. [Emphasis added.]

In *Bache & Co.*, *supra*, the court observed that goggles do not in any manner affect the rays of light or alter or affect the vision produced. In the *U. S. D. Importing Co.* case, *supra*, the court, in pointing out the functional differences between diving masks and goggles, which were originally used for diving, said:

\* \* \* masks not only give the diver undistorted vision, but also protect the sinuses, and \* \* \* cover the nose. \* \* \*

Added to these judicial observations on the visual aspects of goggles is the common meaning of the term as a kind of spectacle having plain glass pieces, as defined in standard dictionaries. The testimony in this case corroborates the notion that plain glass fronts (or plano-lenses, as that term is used in the optics field) do not affect the light rays passing through and leave the viewer's vision unaffected as well. Exhibit 6 is an example of a plane or planolens and, as was pointed out by Dr. Henkind (R. 32), it amounts to the layman's idea of plain window glass.

Of course, there is the problem of how much distortion would affect the classification of an article as a goggle. Distortion could range from an almost imperceptible degree to the extent described by the court in the *American Thermo-Ware* case, *supra*. To a large extent this would seem to depend upon the type of goggle involved and its capacity to realistically perform the normal uses of that type of goggle. Based on the record as developed in this case, namely, the testimony concerning the amount of distortion and disturbance caused from the wearing of the involved articles, together with the demonstrative comparison between the use of a planolens or plain glass lens and the plastic eyepiece here involved, as recorded in plaintiff's exhibit 3, it would appear that these imported goggles, of a type to be worn by cyclists, lack the operational features of that kind of goggle.

However, while it appears that the imported articles are not capable of realistic use as goggles, the record is rather vague as to just what they are used for. Plaintiff, curiously enough, argues first, that the record establishes that they are carnival and novelty items used to amuse both adults and children and, as such, are not enumerated in any provision of the tariff act and, therefore, are within the purview of paragraph 1558. Secondly or alternatively, plaintiff continues, if the court is of the opinion that the testimony is insufficient to establish that they are items used to amuse adults, then the record is sufficient to establish that they are chiefly used to amuse children and dutiable under paragraph 1513 as toys.

As it is in every classification dispute, the plaintiff carries the twofold burden of not only overcoming the presumed correct classification of the collector but of affirmatively establishing the classification claimed. Before classification can be made under the provisions of paragraph 1558, it must be shown that the merchandise is not provided for elsewhere. *General Electric Co.* v. *United States*, 4 Ct. Cust. Appls. 398, T.D. 33839. In the instant case, as recognized by plaintiff, the record indicates that the articles may have chief use in amusing children and, therefore, require classification under paragraph 1513. But on the basis of the information before the court, as pointed out by defendant, the chief use of these items has not been effectively demonstrated. The only clear-cut evidence on use was given by plaintiff's witness Pressner who testified that he had seen children using the items playing games of "let's pretend." The areas of his observation covered the streets of New York and the West Coast. Plaintiff's witness Katcher, on the other hand, testified that he had used the merchandise as part of a costume for a masquerade party and also that he had seen his children using it while riding bicycles and running around. Plaintiff cites several cases for the

proposition that a few or even a single witness can offer sufficient testimony concerning the use of an article. However, the sufficiency of the evidence is always judged on the particulars of each situation. Here, plaintiff is attempting to affirmatively establish the chief use of these articles as toys, which element of proof was usually not present in the cases relied on. While the court may recognize that the use in one or several areas of the country may be indicative of use in the country as a whole (*United States* v. *F. W. Woolworth Co.*, 23 CCPA 98, T.D. 47765), nevertheless, the time when used, and the ages of those involved are necessary elements for the classification of an item under the toy paragraph. *H. J. Baker & Bro.* v. *United States*, 37 CCPA 52, C.A.D. 419; *United States* v. *Harry Grunberg*, 41 CCPA 1, C.A.D. 520. The present record in these respects is inadequate. However, while the use of the imported articles has not adequately been established, the plaintiff cannot be said to have made out an affirmative case for the classification of said items as nonenumerated articles under paragraph 1558.

Therefore, plaintiff having failed to sustain its twofold burden, the protest is overruled without affirming the classification of the collector. Judgment will be rendered accordingly.

CONCURRING OPINION

NICHOLS, Judge: I concur in the result.